[No. S026143. Jan. 31, 1994]

PUBLIC RESOURCES PROTECTION ASSOCIATION OF
CALIFORNIA et al., Plaintiffs and Appellants, v.
CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE
PROTECTION et al., Defendants and Respondents;
LOUISIANA-PACIFIC CORPORATION, Real Party in Interest.

PUBLIC RESOURCES PROTECTION ASSOCIATION OF
CALIFORNIA et al., Petitioners, v.
THE SUPERIOR COURT OF MENDOCINO COUNTY, Respondent;
CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE
PROTECTION et al., Real Parties in Interest.

## COUNSEL

Susan Brandt-Hawley for Plaintiffs and Appellants and for Petitioners.

Glen H. Spain, Rodney Richard Jones, Joanne Alexandra Moore, Dennis Cunningham, Paul V. Carroll, Remy and Thomas, James G. Moose and John H. Mattox as Amici Curiae on behalf of Plaintiffs and Appellants and Petitioners.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, R. H. Connett and Walter E. Wunderlich, Assistant Attorneys General, Sara J. Russell and M. Anne Jennings, Deputy Attorneys General, for Defendants and Respondents and for Real Parties in Interest.

No appearance for Respondent Superior Court.

Rawles, Hinkle, Carter, Behnke & Oglesby, Jared G. Carter, John A. Behnke, Frank Shaw Bacik and Cindee F. Mayfield for Real Party in Interest.

Ronald A. Zumbrun, Robin L. Rivett, Peter Fullerton, Daniel J. Popeo, Richard A. Samp, Pillsbury, Madison & Sutro, Walter P. Allan, Alson R. Kemp, Jr., Mark H. Penskar and Michael F. La Bianca as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**PANELLI, J.**—Two years after the Department of Forestry and Fire Protection (department) approved a timber harvesting plan submitted by Louisiana-Pacific Corporation, the Board of Forestry (board) adopted emergency regulations, later made permanent, designed to protect the northern spotted owl. (Cal. Code Regs., tit. 14, §§ 919.9 and 919.10 [hereafter generally, rules].) The Court of Appeal ordered the department to set aside its approval of Louisiana-Pacific's timber harvesting plan, so that Louisiana-Pacific

could either prepare a new plan that conformed to the northern spotted owl rules or demonstrate that it had incurred substantial liabilities that should exempt it from having to do so. In reaching its conclusion, the Court of Appeal relied on the now-repealed initial emergency rules, the relevant section of which required every timber harvesting *plan* located in the range of the northern spotted owl to contain certain information; in fact, at both the time the Court of Appeal raised the issue and the time it filed its opinion, the permanent rules were in effect. These rules, which substantially amended the initial emergency rules, require "[e]very proposed timber *operation*" (italics added) to "follow one of the procedures required in subsections (a)-(g)" for the protection of the northern spotted owl. The timber operations at issue here, having been substantially stayed by court order, were "proposed timber operations" under the permanent rules and were therefore obliged to conform to their requirements.

The conclusion that timber operations under this plan must comply with the permanent owl rules, however, does not require that the department vacate its approval of this timber harvesting plan. The Z'berg-Nejedly Forest Practice Act of 1973 (Pub. Resources Code, § 4511 et seq. [the Act or Forest Practice Act]) permits the timber operator, depending on which alternative it selects, to resubmit its plan for approval, to file an amendment to the timber harvesting plan reflecting the measures it has taken to comply with the rule, or, if the method of compliance constitutes only a minor deviation from the original plan, to notify the director of the department of the deviation immediately in writing. We therefore reverse the judgment of the Court of Appeal directing the department to vacate its approval of the plan.[1]

### Procedural Background

Timber harvesting operations in this state must be conducted pursuant to a timber harvesting plan submitted to and approved by the department. (Pub. Resources Code, § 4581;[2] and generally, the Act, § 4511 et seq.) The minimum contents of a timber harvesting plan are set forth in section 4582.

---

[1]Because none of the initial briefs addressed the effect of the amendment of the regulations on this case, we requested supplemental briefing on the issue. That briefing revealed a discrepancy between the text of the permanent regulation as certified by the Office of the Secretary of State and as published in the California Code of Regulations (Cal. Code Regs., tit. 14, § 919.9). Although the parties and the Court of Appeal reasonably relied on the version published in the California Code of Regulations, the version on file with the Secretary of State is the correct version, and is published in the department's Forest Practice Rules, an unofficial compilation of regulations. The statutory presumption that the text of a regulation as published in the California Code of Regulations is the text so adopted has therefore been rebutted. (See Gov. Code, § 11344.6.)

[2]All further statutory references are to this code unless otherwise indicated.

In addition to the information specified in section 4582, the plan must contain "[a]ny other information the board provides by regulation to meet its rules and the standards of this chapter." (§ 4582, subd. (j).)[3] Section 4551 requires the board to adopt forest practice rules and regulations "to assure the continuous growing and harvesting of commercial forest tree species and to protect the soil, air, fish, and wildlife, and water resources, including, but not limited to, streams, lakes, and estuaries."

Unless the department concludes that a preharvest inspection is unnecessary, it must inspect the area in which the timber harvesting is to take place within 10 days from the date the timber harvesting plan is filed.[4] The director of the department has 15 days from the date of the initial inspection (or, if the department found an inspection unnecessary, 15 days from the date the timber harvesting plan was filed) to review the plan to determine whether it conforms to the rules and regulations of the board and to the provisions of the Act. (§§ 4604, 4582.7.) If the director determines that the timber harvesting plan does not comply with the applicable statutes and rules, he or she must return the plan, indicating the reasons for the return and advising the person submitting the plan of his or her right to a hearing before the board. Any appeal must be filed within 10 days from the receipt of the returned plan, and the board must rule on the appeal within 30 days from the date it was filed, unless the parties agree to a later date. (§ 4582.7.) "If the director does not act [on the plan] within 25 days, or a longer period mutually agreed upon by the director and the person submitting the timber harvesting plan, timber operations may commence pursuant to the plan, and all provisions of the plan shall be followed as provided in this chapter." (*Ibid.*)

## FACTS

On September 12, 1988, real party in interest Louisiana-Pacific Corporation (Louisiana-Pacific) submitted a timber harvesting plan to the department for the logging of 437 acres of second growth redwood and Douglas fir near the North Fork of the Navarro River in Mendocino County. The plan, 1-88-665 MEN, was accepted for filing on October 5, 1988, and an inspection took place on October 13, 1988. On October 28, 1988, the director of the department found the plan to be "in conformance with the rules of Board of Forestry and to State laws, and regulations."

---

[3]At the time the timber harvesting plans relevant to this litigation were submitted to the department, this language was contained in section 4582, subdivision (h). In 1992, section 4582 was amended in certain respects not relevant to the disposition of this matter. The text of former subdivision (h) is now found, unchanged, in subdivision (j).

[4]The 10-day period may be extended by agreement between the department and the person submitting the timber harvesting plan. (§ 4604.)

On November 7, 1988, Public Resources Protection Association of California, the Rural Institute, Mendocino County Environmental Center, Save the North Fork, and Citizens for Watershed Protection (collectively PuRePAC) filed a petition for writ of mandate and application for preliminary injunction challenging the director's finding that the plan conformed to the applicable statutes and regulations. The petition was later amended to seek permanent injunctive relief. A hearing was held on April 17, 1989, in Mendocino County Superior Court; on September 26, 1989, judgment denying the petition for writ of mandate and request for permanent injunctive relief was entered. PuRePAC timely appealed, and, concurrently with its notice of appeal, filed a petition for writ of supersedeas seeking a stay of timber operations pending resolution of the appeal. The Court of Appeal granted the petition and timber operations have remained stayed.[5]

On November 19, 1991, after briefing had been completed, the Court of Appeal, acting on its own motion, requested letter briefs from the parties addressing the question of "whether the emergency rules enacted for the protection of the northern spotted owl (Cal. Code Regs., tit. 14, §§ 919.9, 919.10) apply to the Timber Harvest Plan at issue herein (Pub. Resources Code, § 4583)."[6]

The emergency rules to which the Court of Appeal referred were filed by the board on July 23, 1990, and became effective immediately. (Gov. Code, § 11346.1, subd. (b).) The contents of the rules, the date on which they were filed, and the fact that they went into effect immediately suggest that they were prompted by the July 23, 1990, addition of the northern spotted owl (*strix occidentalis caurina*) to the list of threatened species under the federal Endangered Species Act. (16 U.S.C. § 1531 et seq.; 50 C.F.R. § 17.11 (1992) [list of threatened species]; 55 Fed.Reg. 26114 (June 26, 1990) [adding northern spotted owl to list of threatened species].) The rules were designed to minimize the chances that timber harvesting activities would result in a "taking" of the spotted owl in violation of the federal Endangered

---

[5]After we granted the petition for review in this case (*Public Resources Protection Association of California et al.* v. *California Department of Forestry and Fire Protection* [Louisiana-Pacific Corporation, real party in interest], A047871), we transferred the supersedeas case (*Public Resources Protection Association of California et al.* v. *Mendocino County Superior Court* [California Department of Forestry et al., real parties in interest], A047478) here and consolidated the two cases.

[6]Louisiana-Pacific contends that the Court of Appeal either abused its discretion or exceeded its authority in raising the question of the applicability of the owl rules on its own motion. The Court of Appeal requested supplemental briefing from the parties on the point before oral argument, thereby complying with the requirements of Government Code section 68081. We see no reason to hold that the Court of Appeal exceeded its authority by requesting briefing on the effect of an intervening change in the law on a pending appeal.

Species Act. (Cal. Code Regs., tit. 14, §§ 898.2, subd. (f) & 919.9.) They add to the Forest Practice Rules (*id.*, § 895 et seq.), inter alia, the federal definitions of "take," "harm," and "harass," (*id.*, § 895.1) and a section requiring the director of the department to disapprove a plan as not conforming to the rules of the board if "[i]mplementation of the plan as proposed would result in the taking of an individual Northern Spotted Owl prohibited by the federal Endangered Species Act." (*Id.*, § 898.2, subd. (f).) Two additional sections designed to protect the northern spotted owl require specific action on the part of the plan submitter and the department. Section 919.9 of title 14, California Code of Regulations, as initially filed on July 23, 1990, provided that "[e]very timber harvesting plan located in the range of the northern spotted owl shall contain the information required in subsections (a), (b), or (c) below for the area within the THP boundary as shown on the THP map and also for adjacent areas as specified within this section. The information shall be used to determine whether or not the proposed activity would result in the 'take' of an individual northern spotted owl." (Register 90, No. 40 (Oct. 12, 1990).)

The Court of Appeal, concluding that timber harvest plan 1-88-665 MEN was required to conform to these rules and to section 919.9 of title 14, California Code of Regulations, in particular, reversed the order denying PuRePAC's petition for a writ of mandate and remanded the matter with directions "to set aside the approval of the THP, to enable preparation of a new THP which fulfills the requirements of proper investigation into the potential harm to the spotted owl of the proposed logging or, in the alternative, a determination that L-P [Louisiana-Pacific] need not comply with the rules because of 'substantial liabilities' incurred in good faith between the date the THP was approved and the date the emergency owl rules went into effect."

### DISCUSSION

We limit our review to those issues raised by Louisiana-Pacific in its petition for review and addressed by the Court of Appeal in the published portion of its decision. The issues addressed in the unpublished portion of the opinion below were not properly presented to us in a petition for review and fail, in any event, to present questions of statewide significance appropriate for our review.

The question before us, then, is this: Must timber harvesting plan 1-88-665 MEN conform to the rules enacted by the board for the protection of the northern spotted owl?

The Court of Appeal, acting on its own motion, raised this question on November 15, 1991, and, in its analysis, assumed that the initial set of emergency rules had remained in effect without substantive change. The initial emergency enactment of California Code of Regulations, title 14, section 919.9, required "[e]very timber harvesting plan located in the range of the northern spotted owl" to contain certain information pertaining to the spotted owl, raising the question of whether timber harvesting plans that had already been approved were required to conform to this rule.

To resolve what appeared to be an ambiguity in the rule, the parties and the Court of Appeal turned to section 4583. That section provides, and has provided since its enactment, that "[a] timber harvesting plan shall conform to all standards and rules which are in effect at the time the plan becomes effective. Except for stocking standards in effect at the time of commencement of timber operations under a timber harvesting plan, which shall remain in effect for any timberland harvested under such plan, all timber operations shall conform to any changes or modifications of standards and rules made thereafter unless prior to the adoption of such changes or modifications, substantial liabilities for timber operations have been incurred in good faith and in reliance upon the standards in effect at the time the plan became effective and the adherence to such new rules or modifications would cause unreasonable additional expense to the owner or operator."

Louisiana-Pacific construed the statute as making a clear distinction between timber harvesting plans and timber operations; only timber operations were required to comply with rules enacted after the timber harvesting plan had been approved. Because the rules enacted for the protection of the spotted owl were not rules that affected the conduct of timber operations, but were, rather, rules relevant to the process by which timber harvesting plans are approved, under Louisiana-Pacific's construction of the statute, the approved plan did not have to be invalidated and reprocessed to conform to the requirements of the new rules.

The Court of Appeal rejected Louisiana-Pacific's distinction between a timber harvesting plan and the operations conducted under the auspices of that plan as "artificial": "It is the [timber harvesting plan] which governs and carefully delimits the parameters of the proposed timber operations. A change in the required contents of the [timber harvesting plan], such as detailed information to ensure that timber operations do not impact the spotted owl, necessarily affects timber operations. The only reason the Legislature said that 'timber operations,' rather than a 'timber harvest plan,' would be subject to subsequent rule changes is obvious: the plan itself is

already completed and the only operative activity is the actual act of logging, i.e., timber operations."

 We conclude, however, that both the parties and the Court of Appeal erred in assuming that section 4583 provided a rule of interpretation that would resolve the question of whether an approved timber harvesting plan was required to conform to rules enacted by the board after its approval. The correct answer to that question lies not in the provisions of section 4583, but in the language of the rules themselves: It is the text of the rule that determines how it is to be applied. Therefore, a rule that addresses proposed timber harvesting plans would apply to proposed plans, while a rule that addresses proposed timber operations would apply to proposed operations. It is the board, in drafting the rules, that determines in the first instance to which plans and operations the rules are to be applied. This is because it is the board, and not the courts, that establishes forest policy.

 Were we to find an ambiguity in the rules, the proper remedy would be a remand to the board so that it may clarify the ambiguity. However, in the absence of an ambiguity, we will uphold the board's rules as they are written unless we find them to be beyond the board's authority. (Gov. Code, §§ 11342.1 and 11342.2; see generally, *Association for Retarded Citizens* v. *Department of Developmental Services* (1985) 38 Cal.3d 384, 390-391 [211 Cal.Rptr. 758, 696 P.2d 150].) Importantly, in this case, the board eliminated an initial ambiguity in the rules by amending them. The amended version of the rules governs and disposes of this litigation and requires us to reverse the judgment of the Court of Appeal.

The Legislature has vested in the board the authority to adopt forest practice rules and regulations "to assure the continuous growing and harvesting of commercial forest tree species and to protect the soil, air, fish, and wildlife, and water resources . . . ." (§ 4551.) It has expressly granted to the board the power to continuously review and revise those rules (§ 4553), and, in section 4555, specifically authorizes the director of the department to withhold approval of a timber harvesting plan if the director determines that existing rules are insufficient to prevent significant harm to the natural resources of the state. If the board concurs in the director's conclusion, it is required to amend the rules by emergency regulation so that they conform to the intent of the Act. The director then has 15 days to act on the pending timber harvesting plan.

While section 4583 confirms the board's broad rulemaking authority, it imposes two significant limitations upon the exercise of that authority: (1) If

the plan calls for reforestation, stocking standards in effect when operations begin may not be changed; and (2) an owner or operator need not comply with a rule change if it has incurred "substantial liabilities" in reliance on the existing rules and adherence to the new rules would cause "unreasonable additional expense." Apart from these two limitations, section 4583 recognizes the board's authority to adopt rules governing ongoing timber operations and expressly requires that timber harvesters comply with such rules. The board, therefore, at all times, has had the authority to require timber operators to submit the information contained in the emergency owl rules unless the operator could demonstrate that to do so would cause it an unreasonable expense. To implement that policy decision, it need only have formulated a rule requiring that such information be submitted before timber operations commence. And that is, in fact, what the board ultimately chose to do.[7]

■ At the time the Court of Appeal raised the question, California Code of Regulations, title 14, section 919.9 required "[e]very proposed timber operation" in the range of the northern spotted owl to follow one of seven designated procedures designed for the protection of the spotted owl. (Cal. Code Regs., tit. 14, § 919.9 [hereafter rule 919.9].) Because we have concluded that the Legislature vested in the board the authority to require timber operations to conform to changes in the Forest Practice Rules enacted after the relevant plans have become effective, we accept the rule as valid. (§ 4583.) The question before us, then, is straightforward: Were the timber operations to be conducted under timber harvesting plan 1-88-MEN 665 "proposed timber operations" on or after March 25, 1991 (the date the current version of the rule went into effect), and were they therefore required to conform to the requirements of rule 919.9 of the Forest Practice Rules. The answer, we believe, is equally straightforward: because timber operations had not in fact substantially begun by March 25, 1991, they were

---

[7]The initial emergency rules applied to "every timber harvesting plan located in the range of the northern spotted owl." They were filed July 23, 1990, and became operative on that date. (Register 90, No. 40 (Oct. 12, 1990).) Because no certificate of compliance with Government Code section 11346.1 et seq. was filed with the Office of Administrative Law within 120 days from the date of their filing (Nov. 20, 1990), they were repealed by operation of law on November 21, 1990. (Register 91, No. 4 (Jan. 25, 1991).) (Gov. Code, § 11346.1, subds. (e) and (g).) A new set of emergency rules, valid for 120 days, became effective November 21, 1990, and was similarly repealed by operation of law on March 25, 1991. (Register 91, No. 16 (Apr. 19, 1991).) These interim emergency rules required information from "[e]very *proposed* timber harvesting plan." (Italics added.) The final set of regulations, which we conclude apply here, became effective March 25, 1991 and were made permanent on May 28, 1991. (Register 91, No. 28 (July 26, 1991).) This final version required that "[e]very proposed timber *operation*" in the range of the northern spotted owl follow one of seven designated procedures designed for the protection of the northern spotted owl. (*Ibid.*, italics added.)

"proposed timber operations" within the meaning of rule 919.9, and were therefore obliged to conform to its requirements.

 Our conclusion, as we noted at the outset, does not require that the department vacate its approval of this timber harvesting plan. Rule 919.9 specifies that proposed timber operations "shall follow one of the procedures required in subsections (a)-(g) below for the area within the THP boundary as shown on the THP map and also for adjacent areas as specified within this section. The submitter may choose any alternative (a)-(g) that meets the on-the-ground circumstances." The alternatives presented in rule 919.9 address various stages of the timber harvesting process. Subdivision (a) permits a timber harvesting plan submitter to request review of a proposed timber operation by a biologist designated by the department *before* a timber harvesting plan is submitted for filing. Subdivision (b) permits the registered professional forester preparing the timber harvesting plan to include certain information relating to the spotted owl in the plan itself. Subdivision (c) permits a "high priority" review when reliable evidence to be included in a timber harvesting plan demonstrates an absence of spotted owls in the proposed harvesting area. Subdivision (d) permits a timber operator proceeding under a federal "incidental taking" permit to furnish the department with a copy of that permit. Subdivision (e) permits a timber operator proceeding pursuant to a stipulation with the United States Fish and Wildlife Service to provide a copy of that agreement to the department. Subdivision (f) permits the timber operator to demonstrate that its operations conform to the mitigation measures suggested by a designated biologist who has reviewed the operations pursuant to the provisions of subdivision (a). Subdivision (g) sets forth the protective measures that a timber operator must follow when a spotted owl nest or activity center located either within the area to be harvested or within 1.3 miles of the area's boundaries.

When, as is true in this case, a timber harvesting plan governing operations subject to rule 919.9 has already been approved, the alternative selected by the timber harvester from the choices provided in rule 919.9 determines how the harvester is to proceed. Section 4591 permits the timber operator to file an amendment detailing proposed changes from the original plan.[8] If the proposed changes constitute a "substantial deviation" from the original plan, they may not be undertaken until an amendment has been filed

---

[8]Section 4591 provides, in relevant part, that "[a]mendments to the original timber harvesting plan may be submitted detailing proposed changes from the original plan." The use of the permissive "may" in section 4591 indicates that the decision whether to file an amendment rests with the timber harvester and not with the department, although a timber harvester who deviates from its original plan in the absence of either an approved amendment or regulatory

with, and acted upon by, the department in accordance with the provisions of sections 4582.7 and 4583. (§ 4591.)

In section 4591.1, the Legislature has directed the board to "specify by regulation those deviations which may be undertaken by an operator without submission of an amended plan but which must subsequently be reported to the department, and provide for the manner of so reporting." The board, accordingly, has stated that "minor deviations" may be undertaken by the person who submitted the original timber harvesting plan without an amendment, so long as those deviations are reported immediately in writing to the director. (Cal. Code Regs., tit. 14, § 1040.) It has defined "minor deviations" as "any change, minor in scope, in a plan which can reasonably be presumed not to make a significant change in the conduct of timber operations and which can reasonably be expected not to significantly adversely affect timberland productivity or values relating to soil, water quality, watershed, wildlife, fisheries, range and forage, recreation, and aesthetic enjoyment." (*Id.*, § 1036, subd. (a).) All other changes are presumed to be "substantial," and therefore require the department's approval. (§ 4591; Cal. Code Regs., tit. 14, § 1036, subd. (b).) The board has further provided that a timber harvester that considers that its deviations fall within the board's definition of "minor deviations" may, under certain circumstances, submit the proposed deviations to the director, who then has five working days within which to approve them. If the director or his or her representative has not acted upon the proposed deviations within that period, timber operations may commence. (Cal. Code Regs., tit. 14, § 1040.)

Louisiana-Pacific, therefore, may select the alternative in rule 919.9 that it finds best meets the "on-the-ground circumstances" and then, depending on the alternative that it has selected, resubmit its plan for approval, present the information required by rule 919.9 in an amendment to the original timber harvesting plan, or, if the timber harvester concludes that the alternative in rule 919.9 that it has selected effects only a "minor deviation" from the original plan, notify the director of the department of the deviation immediately in writing. (Cal. Code Regs., tit. 14, § 1040.) As Louisiana-Pacific has yet to indicate the means by which it will comply with rule 919.9, we express no opinion as to whether it must secure the department's approval before commencing operations.

---

permission from the board faces the possibility of both a stop order (§ 4602.5) and misdemeanor prosecution (§ 4601) and, as an ultimate sanction, either denial or revocation of a timber harvesting license. (§§ 4573, 4576.)

## DISPOSITION

The judgment of the Court of Appeal is reversed and the stay of timber operations imposed by writ of supersedeas issued by the Court of Appeal in A047478 is vacated.

Lucas, C. J., Mosk, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.