64 Cal.App.4th 826 (1998)
COUNTY OF SANTA CRUZ, Plaintiff and Appellant,
v.
STATE BOARD OF FORESTRY et al., Defendants and Respondents.
Docket No. A079763.
Court of Appeals of California, First District, Division Two.
June 9, 1998.
*829 COUNSEL
Dwight L. Herr, County Counsel, and Tamyra Rice, Assistant County Counsel, for Plaintiff and Appellant.
Daniel E. Lungren, Attorney General, Charles W. Getz IV, Assistant Attorney General, John Davidson and Marc N. Melnick, Deputy Attorneys General, for Defendants and Respondents.
OPINION
RUVOLO, J. 

I
This appeal considers a challenge by appellant County of Santa Cruz (the County) to a regulation issued by respondent California State Board of *830 Forestry (the Board) pursuant to the Z'berg-Nejedly Forest Practice Act of 1973 (Forest Practice Act; Pub. Resources Code, § 4511 et seq.[1]). The challenged regulation, which is found at section 1052.1 of title 14 of the California Code of Regulations[2] (Rule 1052.1), allows a timber owner or operator to file a declaration of emergency with respondent California Department of Forestry and Fire Protection (the Department) in the case of a "financial emergency" which, in effect, allows the immediate commencement of timber operations without the preparation of a timber harvesting plan (THP). The County seeks a judicial declaration that the Board exceeded the scope of its statutory mandate in promulgating Rule 1052.1 because it conflicts with its enabling statute, section 4592, and because it subverts the environmental objectives of the Forest Practice Act and the California Environmental Quality Act (CEQA; § 21000 et seq.).
After considering each of the County's arguments, we can find nothing which divests the Board of its authority to adopt Rule 1052.1 as an exercise of its administrative powers under the Forest Practice Act. Consequently, we uphold the challenged regulation and affirm the trial court's grant of summary judgment for the Board and the Department.

II
Existing law under the Forest Practice Act provides that, prior to conducting a commercial timber operation, the timber operator or owner must submit a THP for review and approval by the Department. (See § 4581; Sierra Club v. State Bd. of Forestry (1994) 7 Cal.4th 1215, 1226-1227 [32 Cal. Rptr.2d 19, 876 P.2d 505].) (1) The THP preparation and approval process is the functional equivalent of the preparation of an environmental impact report (EIR) contemplated by CEQA. (7 Cal.4th at p. 1230; Environmental Protection Information Center, Inc. v. Johnson (1985) 170 Cal. App.3d 604, 611 [216 Cal. Rptr. 502]; see also § 21080.5.) Though narrower in scope than an EIR, the purpose of a THP is to identify the proposed harvest plan, provide public and governmental decisionmakers with detailed information on the project's likely effect on the environment, describe ways of minimizing any significant impacts, point out mitigation measures, and identify any alternatives that are less environmentally destructive. (Sierra Club v. State Bd. of Forestry, supra, 7 Cal.4th at pp. 1229-1230.)
The Forest Practice Act also authorizes the Board to adopt regulations exempting certain activities from the THP process. For example, section 4584 authorizes the Board, by regulation, to exempt from THP requirements *831 a wide range of activities, including the cutting or removal of dead, dying, or diseased trees of any size; the cutting and removal of trees to clear fire breaks, and the removal of flammable vegetation and trees posing a fire threat to structures; cutting of trees for utility rights-of-way; harvesting of Christmas and ornamental trees; and the one-time conversion of less than three acres to a nontimber use. The Board has adopted rules implementing section 4584. (Rule 1038.)
Existing law also permits a professional forester to file an "emergency notice" under section 4592 which provides for immediate commencement of logging activities under certain emergency conditions without first securing the Department's approval of a THP. Section 4592 states: "Notwithstanding any other provisions of this chapter, a registered professional forester [RPF] may in an emergency, on behalf of a timber owner or operator, file an `emergency notice' with the department that shall allow immediate commencement of timber operations. The emergency notice shall include a declaration, under penalty of perjury, that a bona fide emergency exists which requires immediate harvest activities.... Those emergencies shall be defined by the board and may include, but are not limited to, the necessity to harvest to remove fire-killed or damaged timber or insect or disease-infested timber, or to undertake emergency repairs to roads." (Italics added.)
The Board has promulgated administrative regulations implementing its mandate under section 4592. Rule 1052, entitled "Emergency Notice," requires a sworn declaration of "bona fide emergency" authorizing emergency operations. The notice must describe specific conditions constituting the emergency, its cause, the "reason for immediate commencement," the scope, manner and dates of intended operations, and other information. An emergency notice is effective for 120 days.[3] The Board has also promulgated Rule 1052.1, which is at the heart of this controversy. It provides authorization to conduct emergency timber operations if there is a limited feasible harvest opportunity which, if not taken advantage of, would result in a potential financial loss to the owner or operator. The pertinent portion of Rule 1052.1 defines the conditions that constitute a "financial emergency" as follows: "Potential financial loss of timber previously inoperable or unmerchantable due to one or more of the following factors: access, location, condition, or timber volume that has unexpectedly become feasible to harvest provided that the harvest opportunity will not be economically feasible *832 for more than 120 days and provided that such operations meet the conditions specified in [rule] 1038(b)(1)-(10) and meet minimum stocking requirements at the completion of timber operations."[4]
On September 29, 1995, Roger A. Burch's professional forester submitted to the Department a "Notice of Emergency Timber Operations" based on a financial emergency as defined by Rule 1052.1. The Department accepted Burch's emergency notice on the same date. The proposed activity was the construction of 1,000 feet of access road which would be used for future timber harvesting. Burch stated in the notice that an emergency existed because he had obtained an easement for access to Summit Road which required him to construct the road by October 31, 1995, and that a THP could not be processed prior to that deadline. Following approval, Burch constructed the road as proposed under the emergency notice by October 12, 1995. Burch thereafter used the road to conduct timber operations pursuant to a duly approved THP.
*833 The County initiated this action for declaratory and injunctive relief on August 22, 1996. Attacking Burch's invocation of the "financial emergency" procedure authorized by Rule 1052.1 on two broad fronts, the County argued 1) the notice of emergency timber operations filed by Burch should be declared invalid because any "emergency" was in effect self-created by Burch; and 2) the adoption of Rule 1052.1 should be declared invalid because it exceeds the scope of the statute allowing its implementation and because it is in conflict with the goals and objectives of the Forest Practice Act and CEQA. The County alleged that unless restrained by the court, the Department and the Board would continue to allow the emergency notice procedures to be used for alleged financial emergencies exposing the environment to continual damage and harm.
During the underlying proceedings, the County dropped altogether its challenge to the validity of Burch's emergency notice, obviating any further discussion of it in this appeal. Thus, the focus in the trial court and on appeal is limited to the County's argument that Rule 1052.1 is void on its face as outside the scope of authority conferred upon the Board by the Forest Practice Act.
The matter was submitted to the trial court for decision in the form of cross-motions for summary judgment. The trial court rejected the County's argument that the Board exceeded its statutory authority in enacting Rule 1052.1. In its written order, the court stated "[t]he definition of `emergency' is, by statute, left up to the State Board of Forestry, which acted within the provisions of the Forest Practice Act in expanding the definition of `emergency' to include financial considerations of the timber owner." During argument, the court made clear its belief that the Legislature, and not the judiciary, was the proper forum in which the County should seek a remedy: "This is a legislative issue. You're talking to the wrong branch of government here." After judgment was entered for the Department and the Board, the County timely filed a notice of appeal.

III

A.
(2a) The issue before us is simply whether the Board had the authority to promulgate the "financial emergency" exception contained in Rule 1052.1. (3) We address this question de novo. (San Bernardino Valley Audubon Society v. City of Moreno Valley (1996) 44 Cal. App.4th 593, 600 [51 Cal. Rptr.2d 897].) In doing so, we intimate no judgment on whether the regulation at issue was the most practical, appropriate, or environmentally *834 sensitive way of defining an emergency that qualifies for the exemption set out in section 4592. As our Supreme Court stated in Public Resources Protection Assn. v. Department of Forestry & Fire Protection (1994) 7 Cal.4th 111 [27 Cal. Rptr.2d 11, 865 P.2d 728], "[I]t is the board, and not the courts, that establishes forest policy. [¶] ... [I]n the absence of an ambiguity, we will uphold the board's rules as they are written unless we find them to be beyond the board's authority. [Citations.]" (Id. at p. 120.) (2b) Consequently, the issue is simply whether the Board had the legal authority to excuse timber owners and operators experiencing a potential financial emergency from having to comply with the normal THP requirements.
The County contends the Board, as a state administrative agency, had no legal authority to enact Rule 1052.1 without a grant of authority by the Legislature allowing a deviation from the THP process specifically based on potential financial losses by the timber owner or operator. In response, the Board claims it had the needed legislative authority to create the "financial emergency" exception which the Legislature has implicitly vested in the Board by way of the enabling statute, section 4592. In particular, the Board contends the enabling statute grants the Board broad discretionary authority with respect to defining emergencies, including the implied power to consider financial hardships affecting landowners. According to the Board, no further specific "financial emergency" authorization is required.
In reviewing the Board's construction of section 4592, we are guided by the following principles. According to Government Code section 11342.2, "[w]henever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute."
(4) The first of the two criteria for regulatory validity set out in Government Code section 11342.2 requires judicial construction of the claimed source of the agency's rulemaking authority, in this case the statutory boundaries of section 4592. The task of the reviewing court in this regard has been described as "`decid[ing] whether the [agency] reasonably interpreted the legislative mandate.' [Citation.]" (Credit Ins. Gen. Agents Assn. v. Payne (1976) 16 Cal.3d 651, 657 [128 Cal. Rptr. 881, 547 P.2d 993].) As was explained in California Beer & Wine Wholesalers Assn. v. Department of Alcoholic Beverage Control (1988) 201 Cal. App.3d 100 [247 Cal. Rptr. 60], "[w]hat deference should be accorded an administrative construction of a statute itself requires a judicial construction of the limits of the claimed *835 source of rulemaking authority, whether that be the substantive provisions of an applicable statute or the statutory boundaries of a delegated power.... Where the language of the governing statute is intelligible to judges their task is simply to apply it, whether that be language of substantive limitation or the boundaries of a delegation of rulemaking authority. Where the intelligibility of the statutory language depends upon the employment of administrative expertise, which it is the purpose of a statutory scheme to invoke, the judicial role `is limited to determining whether the [agency] has reasonably interpreted the power which the Legislature granted it.' [Citation.]" (Id. at p. 107.)
The second standard set out by Government Code section 11342.2 involves assessing whether the regulation is reasonably necessary to effectuate the purpose of the statute. This receives even more deferential review, essentially requiring only reasonability by the promulgating agency. "In the review of quasi-legislative actions of administrative agencies, judicial review is limited to a determination whether the agency's action is arbitrary, capricious, lacking in evidentiary support, or contrary to procedures provided by law. [Citations.]" (International Business Machines v. State Bd. of Equalization (1980) 26 Cal.3d 923, 931, fn. 7 [163 Cal. Rptr. 782, 609 P.2d 1]; accord, California State Employees' Assn. v. Way (1982) 135 Cal. App.3d 1059, 1065 [185 Cal. Rptr. 747].) In considering whether the regulation is "`reasonably necessary,'" the court will defer to the agency's expertise and is not to superimpose its own policy judgment on the agency in the absence of an arbitrary and capricious decision. (Agricultural Labor Relations Bd. v. Superior Court (1976) 16 Cal.3d 392, 411 [128 Cal. Rptr. 183, 546 P.2d 687].)
(2c) As already noted, section 4592 authorizes the immediate commencement of timber operations if a registered professional forester files an emergency notice under penalty of perjury declaring that a bona fide emergency exists requiring immediate harvest activities. It concludes with the key provision: "Those emergencies shall be defined by the board and may include, but are not limited to, the necessity to harvest to remove fire-killed or damaged timber or insect or disease-infested timber, or to undertake emergency repairs to roads." (Italics added.)
In this case, the legislative purpose was clearly to create a flexible procedure in the case of an emergency whereby logging can proceed without having to go through the normal environmental review process. However, the Legislature declined the opportunity to define the limits of the type of emergencies which would trigger the expedited procedure authorized by section 4592. Instead, the Legislature expressly delegated this task to the *836 Board. Thus, implementing regulations are expressly contemplated, and in fact required, by section 4592.
It is not surprising that the Board has been the recipient of this broad grant of authority. The drafting of detailed or specific legislation may not always be practical or desirable. Under such circumstances, it is prudent to transfer subordinate functions to an administrative agency with the day-to-day expertise and flexibility needed to promulgate legislative-type rules to implement the statute. In an area which touches as many societal interests as timber harvesting, such rules will often, of necessity, embody significant discretionary policy determinations.
The County contends that the specific examples of emergencies set out in section 4592 was intended to limit the expansive grant of authority given the Board under section 4592 to emergencies sharing the characteristics of the defined emergencies. The County frames its argument as follows: "If the Legislature had intended to leave the definition of emergency completely to [the Board's] discretion, it would not have included any specific examples of emergencies in section 4592." We disagree with this syllogistic interpretation of section 4592.
Section 4592 vests broad authority in the Board to promulgate such regulations as are necessary to carry out the conservation and management objectives of the Forest Practice Act. In fact, we consider the language used in section 4592 indicating "emergencies shall be defined by the board and may include, but are not limited to, ..." to be the broadest possible grant of legitimate powers to an administrative agency. Merely because the Legislature chose to specify certain activities as examples of "emergencies" does not mean that it intended to occupy the field in setting the boundaries of the Board's broad rulemaking authority. Indeed, to conclude otherwise would be contrary to the long-standing rule of statutory construction that "include" is a "`term of enlargement rather than limitation.' [Citations.] It has been so interpreted by the courts of this state for almost a century...." (Loyola Marymount University v. Los Angeles Unified School Dist. (1996) 45 Cal. App.4th 1256, 1262 [53 Cal. Rptr.2d 424].)
We also disagree with the County's argument that this case is comparable to the one considered by this division in Environmental Protection Information Center v. Department of Forestry & Fire Protection (1996) 43 Cal. App.4th 1011 [50 Cal. Rptr.2d 892] (EPIC). In EPIC, we considered the validity of an administrative regulation issued by the Board excusing persons owning three acres or less from having to comply with the THP requirement. In contrast to the broad delegation of rulemaking authority in the instant *837 case, in EPIC we construed an enabling statute, section 4584, which speaks very explicitly and in exclusive terms, about the types of situations which qualify for the exemption to the THP requirement. The statutory language of section 4584 indicates "the board may exempt from this chapter or portions thereof, any person engaged in forest management whose activities are limited to any of the following: ..." (§ 4584.) None of the litany of statutorily described activities includes an exemption for timber operations on parcels less than three acres. This court struck down the Board's administrative creation of such an exemption because "[w]hen the Legislature has so directly and in such detail dealt with the subject of what [the Board] may do regarding authorizing exemptions to the requirement of filing a THP, we cannot agree ... [the Board has] the authority to materially broaden those exemptions by regulation." (43 Cal. App.4th at p. 1023.)
In the instant case, the Board was specifically charged with the responsibility of fashioning appropriate regulations implementing section 4592. Faced with the broad legislative mandate of defining the term "emergency," the Board determined that more than one type of situation constituting an emergency is possible under the implementing legislation. This is clearly a reasonable interpretation of the statute and within the scope of the Board's statutory duty. Had the Legislature intended that the regulations defining emergencies be limited to situations "that necessitate immediate action to protect the environment and the public health and safety," as the County contends, it could have said so. Instead, section 4592 sets out no policies or standards restricting the Board's administrative discretion in defining the general term "emergency." Therefore, we conclude the first prong of Government Code section 11342.2 is met and the Board's construction of section 4592 is legally permissible.

B.
Nevertheless, even under the broadest of statutory mandates, an administrative agency may not use its authority to alter, enlarge, subvert or impair the act being administered. (See, e.g., Dyna-Med, Inc. v. Fair Employment and Housing Com. (1987) 43 Cal.3d 1379, 1389 [241 Cal. Rptr. 67, 743 P.2d 1323].) As already noted, the second prong of Government Code section 11342.2 grants the reviewing court the authority to strike down administrative actions that cannot be deemed reasonably necessary to effectuate the purpose of the enabling legislation.
In this case, the County argues that the Board undercut the clear mandate of the Forest Practice Act when it used its statutory discretion to draft a regulation which takes into account potential financial losses in the conduct *838 of timber operations. The County points to an Attorney General's opinion that the Board must adopt regulations for the protection of California's natural resources (see 58 Ops.Cal.Atty.Gen. 250 (1975)) in arguing "the mandate to protect the environment is unfulfilled where a financial emergency is alleged."
All parties concede, as they must, that the Forest Practice Act requires consideration of conservation values. Nevertheless, this court does not agree with the County's argument that conservation is the only factor the Board may consider in promulgating regulations under the Forest Practice Act. On announcing the legislation that was to become the Forest Practice Act, Assemblyperson Edwin L. Z'berg was quoted as saying: "`This is a bill that recognizes the need for timber products and a healthy timber industry. But it provides for prudent and responsible management to promote conservation as well.'" (Comment, Regulation of Private Logging in California (1975) 5 Ecology L.Q. 139, 153-154, fn. omitted.) These dual goals appear repeatedly throughout the legislation.
The Forest Practice Act declares the importance of forest resources, which furnish "high-quality timber, recreational opportunities, and aesthetic enjoyment while providing watershed protection and maintaining fisheries and wildlife." (§ 4512, subd. (b).) The state's policy is defined as "encourag[ing] prudent and responsible forest resource management calculated to serve the public's need for timber and other forest products, while giving consideration to the public's need for watershed protection, fisheries and wildlife, and recreational opportunities alike in this and future generations." (§ 4512, subd. (c).) The legislative goal in enacting the Forest Practice Act is expressed as assuring the "maximum sustained production of high-quality timber products ... while giving consideration to values relating to recreation, watershed, wildlife, range and forage, fisheries, regional economic vitality, employment, and aesthetic enjoyment." (§ 4513, subd. (b).)
The Board is directed to fulfill the mandate set out in sections 4512 and 4513 by adopting "forest practice rules and regulations ... to assure the continuous growing and harvesting of commercial forest tree species and to protect the soil, air, fish, and wildlife, and water resources, including, but not limited to, streams, lakes, and estuaries." (§ 4551.) Although these statutes list economic and environmental considerations in a fashion that suggests these values are harmonious, in reality, they are often conflicting. Thus, the Forest Practice Act's plain language envisions that the Board, in exercising its rulemaking function, will achieve a sound balance between the public interest in protecting and preserving one of California's most precious natural resources and the private interest of those who use these resources to earn their livelihood.
*839 Even accepting the County's argument that resource conservation must be the predominant objective of any regulation promulgated under the Forest Practice Act, the County has not shown that Rule 1052.1 is so devoid of conservation measures as to render the Board's approval of a "financial emergency" regulation arbitrary or capricious. For example, the emergency work may last only a short period. (Rules 1052, subd. (g), 1052.1.) Although emergency timber operations are exempt from preparing a THP, the operations still must comply with "all operational provisions of the Forest Practice Act and District Forest Practice Rules" applicable to THP's. (Rule 1052, subd. (g).) Moreover, financial emergencies must comply with the conditions specified in Rule 1038, subdivision (b)(1) through (10). (Rule 1052.1.) These conditions include no heavy equipment on steep slopes or known slides or unstable areas; and with minor exceptions, no heavy equipment operations within a watercourse or lake protection zone. Timber operations within the buffer zone of a species of special concern are flatly prohibited as are timber operations on any site that satisfies the criteria for a significant archaeological or historical site. Likewise, no timber operations can be conducted which will disturb, threaten or damage the known site of rare, threatened or endangered plants or animals. (Rule 1038.) Furthermore, after completion of logging, the owner must "meet minimum stocking requirements" to reestablish vegetation in the area. (Rule 1052.1; § 4561). While the County argues that more could have been done to promote conservation objectives, these arguments involve questions of fact and policy, the determination of which rests in the legislative branch of the state government.
We also note that since its adoption in 1973, the Legislature has never sought to amend section 4592 in a way that would withdraw or narrow the Board's interpretation of the scope of its authority to define emergencies. (See Moore v. California State Bd. of Accountancy (1992) 2 Cal.4th 999, 1017-1019 [9 Cal. Rptr.2d 358, 831 P.2d 798].) This absence of legislative action is pertinent. In a recent case from this division, we pointed to the Legislature's amendment of section 4592 without substantive change as being indicative of legislative approval of the administrative interpretation of the act. (Elk County Water Dist. v. Department of Forestry & Fire Protection (1997) 53 Cal. App.4th 1, 10-11 [61 Cal. Rptr.2d 536].)
In 1994, the Legislature amended the root source of the Board's rulemaking authority in section 4592  the key language "include, but need not be limited to" was amended without substantive change to read "include, but are not limited to." (Stats. 1994, ch. 746, § 4.) Significantly, Rule 1052.1, which was enacted in 1981, had then been in effect for 13 years. Certainly, by this time, the financial emergency exception set out in Rule 1052.1 was widely known and opponents of this rule were provided an opportunity to *840 make the Legislature aware of their view that the rule was being used as authority to dilute necessary environmental protections. However, there is no evidence that in amending the statute, the Legislature expressly commented or was concerned about the scope of the regulations implementing section 4592.

C.
(5) Lastly, the County argues that the emergency notice procedure, when based on alleged financial emergencies, is contrary to the broad environmental objectives of CEQA. By way of background, certified regulatory programs, such as the regulation of timber harvesting operations by the Department and the Board, remain generally subject to CEQA requirements and policies. (Sierra Club v. State Bd. of Forestry, supra, 7 Cal.4th at pp. 1230-1231.) From this, the County argues: "The financial emergency exemption contained in Rule 1052.1 creates a giant loophole for avoiding CEQA's policies and goals."
A variant of this argument was recently considered, and rejected, in Elk County Water Dist. v. Department of Forestry & Fire Protection, supra, 53 Cal. App.4th 1. There, it was argued that CEQA requires preparation of an environmental review document and public notice and review even for activities declared exempt from the preparation of a THP under sections 4592 and 4585. In response, this court reasoned: "A certification which exempts timber harvesting from the EIR process and substitutes the THP process, as a functional equivalent, exempts by implication those categories of activities which the THP process itself exempts." (53 Cal. App.4th at p. 12.) After so holding, the court indicated that the "policy plea  that the environment would be better protected by having public review and input  is appealing but addressed to the wrong forum. The existing certified program, as authorized by the Legislature, does not require it, and `... it is the board, and not the court, that establishes forest policy.'" (Id. at p. 14, quoting Public Resources Protection Assn. v. Department of Forestry & Fire Protection, supra, 7 Cal.4th at p. 120.)
In conclusion, we see no transgression of the Board's delegated authority in its promulgation of Rule 1052.1, which defines "emergency" to include those conditions that will cause appreciable financial loss to the timber owner unless minimized by immediate harvesting. Rule 1052.1, which implements the language of section 4592, appears well within the authority conferred by the Legislature that "emergencies shall be defined by the board and may include, but are not limited to, the necessity to harvest to remove fire-killed or damaged timber or insect or disease-infested timber, or to *841 undertake emergency repairs to roads." (Italics added.) By inclusion of the language, "include, but are not limited to," the Legislature plainly intended that the three examples of emergencies provided in the statute were not to be deemed exclusive. Furthermore, Rule 1052.1 appears consistent with the conservation and management purposes of the Forest Practice Act and the broad environmental goals of CEQA. Moreover, for the reasons discussed, the Legislature may also be presumed to have acquiesced in the Board's long-standing interpretation of section 4592  an interpretation by an administrative agency expressly charged with its implementation which is not facially arbitrary, capricious or an abuse of discretion.

IV
The judgment is affirmed.
Haerle, Acting P.J., and Lambden, J., concurred.
A petition for a rehearing was denied July 9, 1998, and appellant's petition for review by the Supreme Court was denied September 2, 1998. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.
NOTES
[1] All undesignated statutory references are to the Public Resources Code.
[2] All undesignated rule references are to the California Code of Regulations, title 14.
[3] Rule 1052 provides:

"Before cutting or removing timber on an emergency basis, an RPF on behalf of a timber owner or operator shall submit a Notice of Emergency Timber Operations to the Director, in a form prescribed by the Director. Said notice shall contain a declaration, made under penalty of perjury, that a bona fide emergency exists which requires emergency timber operations. The notice shall include, but not be limited to, the following:
"(a) Names and addresses of all timberland owner(s), timber owner(s), and timber operator(s) for the area on which timber will be cut or removed.
"(b) A description of the specific conditions that constitute the emergency, its cause, extent and reason for immediate commencement of timber operations.
"(c) Legal description of the area from which timber will be cut or removed.
"(d) A map of suitable scale showing the area from which timber will be cut or removed, the legal description, roads and Class I, II, III and IV watercourses.
"(e) Harvesting method to be followed.
"(f) The expected dates of commencement and completion of timber operations.
"(g) Name, address, license number, and signature of the RPF who prepares the notice and submits it to the Director on behalf of the timber owner or operator. Timber operations pursuant to an emergency notice shall comply with the rules and regulations of the Board, except where, upon agreement between the RPF and the Department, waiver of a rule would better mitigate the causes of a non-financial emergency. A person conducting timber operations under an Emergency Notice shall comply with all operational provisions of the Forest Practice Act and District Forest Practice Rules applicable to `Timber Harvest Plan', `THP', and `plan'. Timber operations pursuant to an Emergency Notice may not commence for five working days from the date of the Director's receipt of the Emergency Notice unless such waiting period is waived by the Director. The Director shall determine whether the emergency notice is complete. If it is found to be complete the Director shall send a copy of a notice of acceptance to the timberland owner. If the Emergency Notice is not complete it shall be returned to the submitter. If the Director does not act within five working days of receipt of the Emergency Notice, timber operations may commence. Timber operations shall not continue beyond 120 days after the Emergency Notice is accepted by the Director unless a plan is submitted to the Director and found to be in conformance with the rules and regulations of the Board."
[4] Rule 1052.1 also contains several definitions of emergency conditions which the County does not challenge, including removing trees which are dead or dying as a result of disease or infestation; removing trees that are fallen or damaged due to wind, fire, or pollution; and removing trees for the emergency construction or repair of roads.